UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Bernard Holmes,<br><br>Defendant. | Case No. 20-cr-221 (ECT/HB)<br><br>**REPORT AND RECOMMENDATION** |

HILDY BOWBEER, United States Magistrate Judge

This matter is before the Court on Defendant Bernard Holmes' Motion to Suppress Statements, Admissions, and Answers [ECF No. 41] and Motion to Suppress Evidence Obtained as a Result of Search and Seizure [ECF No. 42]. The motions were referred to this Court for a report and recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. For the reasons set forth below, the Court recommends that both motions be denied.

**I.     Background and Procedural History**

On October 7, 2020, Defendant Bernard Holmes was charged by Indictment with one count of Impersonating a Federal Officer. (Indictment at 1 [ECF No. 1].) The Indictment alleges that on July 24, 2017, Holmes pretended to be a Special Agent of the Federal Bureau of Investigation ("FBI") and

> spoofed his telephone number to make it appear that he was calling EGW from the FBI's Minneapolis Field Office; provided EGW with his purported name, 'FBI Special Agent John Tidwell,' and purported FBI badge number; falsely stated to EGW that he was investigating terrorism-

> related conduct involving EGW's household; asked questions of EGW in furtherance of the purported terrorism investigation; and provided EGW with directions for what EGW should do to assist the purported FBI investigation.

(*Id.*)

Holmes filed his motions to suppress statements and evidence on January 14, 2021. Through his motion to suppress statements, he challenges the admissibility of statements he made to law enforcement officers on July 23, 2018. (Def.'s Mot. Suppress Statements at 1 [ECF No. 41]; Mot. Hr'g Tr. at 10–12 [ECF No. 55]; Def.'s Mem. Supp. Mots. Suppress at 1 [ECF No. 57].) Through his motion to suppress evidence, Holmes challenges the admissibility of evidence seized pursuant to a SpoofCard search warrant for telephone number 612-615-xxxx. (Def.'s Mot. Suppress Evid. at 1 [ECF No. 42]; Mot. Hr'g Tr. at 6–7, 9; Def.'s Mem. Supp. Mots. Suppress at 1.)

The Court held a hearing on the motions on May 11, 2021, at which the Government submitted the following exhibits:

- SpoofCard Search Warrant (Gov't's Ex. 2);
- Aware Call Recording Email for 7/9/2018 Call to Carolyn Kne (Gov't's Ex. 3A);
- [Second] Aware Call Recording Email for 7/9/2018 Call to Carolyn Kne (Gov't's Ex. 3B);
- July 23, 2018 Holmes Video Interview (Gov't's Ex. 4A); and
- July 23, 2018 Holmes Interview Transcript (Gov't's Ex. 4B).

(Mot. Hr'g Ex. List [ECF No. 53].) Holmes filed his post-hearing memorandum in support of his motions to suppress on June 15, 2021 [ECF No. 57], and the Government filed its post-hearing memorandum in opposition on June 29, 2021 [ECF No. 59].

2

## II.  Motion to Suppress Evidence

Holmes contends the SpoofCard search warrant was overbroad in temporal scope and lacked sufficient particularity with respect to the items to be searched and seized. (Def.'s Mem. Supp. Mots. Suppress Evid. at 5–7.)

### A.  The Search Warrant and Supporting Affidavit

FBI Special Agent Travis Yarbrough applied for the search warrant at issue and provided a sworn affidavit in support of the warrant. (Gov't's Ex. 2 at 1.)[1] The Honorable Becky R. Thorson, United States Magistrate Judge, signed the warrant on May 26, 2020. (*Id.*)

#### 1.  The Warrant and Attachments A and B

The face of the warrant refers to Attachment A for a description of the property to be searched and to Attachment B for the items to be seized. (*Id.*) Attachment A describes the property to be searched as:

> information associated with the account created on December 28, 2016, with the phone credential identifier +1612615[xxxx] (hereinafter, "**Subject Account**") that is stored at premises controlled by SpoofCard, LLC, which includes www.spoofcard.com . . . . This warrant requires SpoofCard, LLC, to provide all information within the possession, custody, or control of SpoofCard, LLC, including any records, files, logs, or information (including the content of recorded telephone calls) that have been deleted but [are] still available to SpoofCard, LLC, through the date of the execution of the search warrant.

(*Id.* at 4.)

---

[1] The search warrant, Attachment A, and Attachment B are paginated, but Agent Yarbrough's affidavit is not. (*See* Gov't's Ex. 2.) Thus, the Court cites to the page numbers on the exhibit for the search warrant, Attachment A, and Attachment B, but to the paragraph numbers for the affidavit.

Attachment B describes in several paragraphs the items to be seized. (*Id.* at 5.) The first paragraph of Attachment B identifies the information to be *disclosed* by SpoofCard, LLC as the information for the Subject Account described in Attachment A, including telephone calls; electronic records, files, information, or logs; and deleted information that had been preserved. (*Id.*) The next four paragraphs of Attachment B limit the above information to:

    a.    The contents of all recorded telephone conversations associated with the account, including stored or preserved copies of telephone conversations using the account, the geographic information for the server source and destination associated with each telephone call, and the date and time at which each call occurred;

    b.    All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

    c.    The types of service utilized;

    d.    All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

(*Id.* at 5–6.)

The information to be *seized* by the government is described in the final paragraph of Attachment B: "All information described above . . . that constitutes evidence of violations of 18 U.S.C. §§ 912 and 1343 and related offenses, occurring in 2016 and after involving Bernard Holmes and/or Otis Mays, Jr., and/or any users of the Subject Account, the probable cause for which is set forth in the attached Affidavit, which is

4

hereby incorporated by reference," including information for the Subject Account that pertains to:

> (1) any information involving a scheme and artifice to defraud through false claims and statements to others in order to induce them to make payments;
>
> (2) any information involving a party falsely assuming or pretending to be another party in order to demand or obtain something of value; [or]
>
> (3) any information involving a party falsely assuming or pretending to be an officer or employee acting under the authority of the United States (or any department, agency or officer thereof).

(*Id.* at 6.)

### 2. The Supporting Affidavit

Special Agent Yarbrough's affidavit describes the investigation into Otis Mays, Jr.'s ("May's") scheme to defraud and Holmes' alleged involvement. According to that affidavit, Mays told two individuals, EGW and IMW, that he was an attorney, which was not true, and that he could assist them with various legal matters. (Yarbrough Aff. ¶ 6.) Mays also told EGW and IMW that their son was being investigated for federal criminal terrorism, which was not true, and that Mays could help their son in several ways for a total of $341,222. (*Id.*) EGW and IMW paid the money, and Mays was later charged with three counts of wire fraud. (*Id.*) He pleaded guilty to one charge of wire fraud. (*Id.* ¶ 7.)

While the scheme was being investigated, EGW told an officer that he had been contacted via telephone by a man who had identified himself as FBI "Agent Tidwell" and that "Agent Tidwell" told EGW his son was facing federal criminal charges. (*Id.* ¶ 9.)

Comcast telephone records showed that on July 24 and 26, 2017, EGW received a call to his home number from the main number for the FBI Minneapolis Field Office. (*Id.* ¶ 10.) A warrant-authorized search of Mays' phone yielded 15 recorded telephone conversations in July and August 2017 between Mays and "Agent Tidwell," and the phone number for "Agent Tidwell" was 612-615-xxxx. (*Id.*)

The AT&T account holder for 612-615-xxxx was an individual with the initials "T.A.," but the email on the account was "bholmes3@xxx.xxx. (*Id.* ¶ 12.) In addition, the AT&T account notes showed that Holmes was an authorized user of the phone, and Holmes had told a police officer on July 23, 2018, that his phone number was 612-615-xxxx. (*Id.* ¶¶ 12, 14.) Phone records for 612-615-xxxx on July 24, 2017, showed a number of calls dialed to an access phone number for SpoofCard. (*Id.* ¶ 13.)

SpoofCard allows customers to alter (spoof) the caller ID displayed on the phone of the person they are calling. (*Id.*) To "spoof" a call, the SpoofCard customer dials one of SpoofCard's access numbers and enters both the recipient's phone number and the phone number the caller wants to appear on the caller ID. (*Id.* ¶ 16.) SpoofCard also allows customers to change their voices or add background sounds. (*Id.*)

In April 2020, investigators received SpoofCard records for the number 612-615-xxxx, associated with the Subject Account. (*Id.* ¶ 17.) The user of the Subject Account spoofed the number for the Minneapolis FBI Field Office for one call on July 24, 2017, and for three calls on July 26, 2017. (*Id.* ¶ 19.) The July 24 call and one of the July 26 calls were made to EGW's phone. (*Id.*) The user of the Subject Account also spoofed the phone numbers of several state and local government entities in 2017 and 2018. (*Id.*

6

¶ 20.) On March 31, 2020, the SpoofCard Account used an IP address that was associated with Holmes' residence, as confirmed by Comcast. (*Id.* ¶ 21.)

B.  **Whether the Warrant Was Insufficiently Particular or Overbroad**

A search warrant must describe with particularity the place to be searched and the items or persons to be seized. U.S. Const. amend IV; *see United States v. Horn*, 187 F.3d 781, 788 (8th Cir. 1999) ("To satisfy the particularity requirement of the fourth amendment, the warrant must be sufficiently definite to enable the searching officers to identify the property authorized to be seized."). The particularity requirement "is a standard of 'practical accuracy' rather than a hypertechnical one." *United States v. Peters*, 92 F.3d 768, 769–70 (8th Cir. 1996).

Holmes' Fourth Amendment challenge centers on the items to be seized, rather than the place to be searched. (*See* Def.'s Mem. Supp. Mots. Suppress at 7.) "The degree of specificity required in applying the particularity requirement is flexible and may vary depending on the circumstances and the types of items involved." *United States v. Kail*, 804 F.2d 441, 445 (8th Cir. 2011) (cleaned up). For a scheme to defraud, for example, "a search warrant is sufficiently particular in its description of the items to be seized if it is as specific as the circumstances and nature of activity under investigation permit." *Id.* (cleaned up).

Holmes finds fault with the warrant's authorization to seize what he describes as a "broad array of items." (Def.'s Mem. Supp. Mots. Suppress at 7.) He concedes that the supporting affidavit describes the likely recipients of calls made via the SpoofCard account, but contends that the warrant does not limit the search to calls made to or

received by those parties. (*Id.*) He contrasts the warrant in this case with the warrant in *Horn*, which authorized the seizure of "any and all . . . correspondence, videotapes, published materials, and other objects relating to contact with an unidentified woman in Texas." 187 F.3d at 788. The Eighth Circuit found that language sufficiently particularized by the additional limitation that the "objects seized had to be identifiably related to a woman in Texas with two girls and a boy, either by referring to the woman in some specific way, by depicting her and her children, or at the very least by bearing a Texas address together with a woman's name or in a woman's handwriting." *Id.*

Here, even though the SpoofCard warrant did not describe the information to be seized in terms of calls made to or received by the recipients mentioned in the affidavit, the warrant contained other limitations. As described in Attachment B to the warrant, the information to be seized had to constitute "evidence of violations of 18 U.S.C. §§ 912 and 1343 and related offenses, occurring in 2016 and after involving Bernard Holmes and/or Otis Mays, Jr., and/or any users of the Subject Account," including:

> (1) any information involving a scheme and artifice to defraud through false claims and statements to others in order to induce them to make payments;
>
> (2) any information involving a party falsely assuming or pretending to be another party in order to demand or obtain something of value; [or]
>
> (3) any information involving a party falsely assuming or pretending to be an officer or employee acting under the authority of the United States (or any department, agency or officer thereof).

(Gov't Ex. 2 at 6.) Thus, the information to be seized was limited to the specific crimes and individuals under investigation. Where a warrant identifies the specific crimes under

investigation and the items to be seized are electronic records, the warrant need not identify specific recipients to comply with the Fourth Amendment. *United States v. Nejad*, 436 F. Supp. 3d 707, 726, 729 (S.D.N.Y. 2020) (addressing particularization in the context of emails).

There are two more considerations relevant to the particularization inquiry. First, the search of information for a single SpoofCard account is relatively small in scope and does not raise the same privacy concerns as the search of a phone, for example, which may store information for hundreds of accounts as well as other personal and financial information. *See Riley v. California*, 573 U.S. 373, 386 (2014) ("Cell phones . . . place vast quantities of personal information literally in the hands of individuals.").

Second, Special Agent Yarbrough's affidavit described numerous calls between November 2017 and November 2018 placed by 612-615-xxxx that spoofed the numbers of state and local government entities. It would be reasonable to infer from that assertion and the other assertions in the affidavit that the caller spoofed those numbers to conceal his or her identity from the recipient of the call and represented that he or she was associated with those entities. Including these other possible instances of spoofing for an unlawful or deceptive reason supported a broader description of the information to be seized.

In sum, given the type and nature of information to be seized, the nature of the crimes under investigation, and the other circumstances described above, the Court finds

9

the warrant was sufficiently particular.[2]

Holmes next contends the warrant was overbroad in temporal scope because it authorized the seizure of information between 2016 and the date the warrant was executed. (Def.'s Mem. Supp. Mots. Suppress at 7.) Holmes asserts the warrant should not have authorized the seizure of information before the scheme alleged in the affidavit began or after October 2019, when Mays pleaded guilty, because the scheme had ended by then. (*Id.*)

Special Agent Yarbrough's affidavit avers that the SpoofCard Subject Account was created on December 28, 2016, and that SpoofCard records documented 116 calls between February 6, 2017, through February 10, 2020, originating from 612-615-xxxx. (Yarbrough Aff. ¶ 18.) Calls from 612-615-xxxx between November 2017 and November 2018 were made using spoofed numbers from local and state government

---

[2] The Court has considered—and rejected—the Government's argument that the incorporation of Special Agent Yarbrough's affidavit into the warrant provided additional particularity. A supporting affidavit can provide additional particularity only if two conditions are met: "a) the affidavit accompanies the warrant, and b) the warrant uses suitable words of reference which incorporate the affidavit therein." *United States v. Curry*, 911 F.2d 72, 77 (8th Cir. 1990); *see also Groh v. Ramirez*, 540 U.S. 551, 558 (2004). Here, Attachment B to the warrant expressly incorporated Special Agent Yarbrough's affidavit into the description of information authorized to be seized. However, the Government presented no evidence—and none can be inferred from the record—that the affidavit accompanied the warrant to the SpoofCard premises where the warrant was executed or that it was in the hands of the officers who conducted the search of the information disclosed by SpoofCard for information to be "seized." The Government asserts in its memorandum that "the affidavit accompanied the warrant when it was presented to Magistrate Judge Thorson" (Gov't's Mem. Opp'n Mots. Suppress at 27 [ECF No. 59]), but that is not the test. The Government further asserts that the affidavit was "available" to the officers executing the warrant (*id.* at 28), but there is no evidence of that in the record, nor is "availability" the test.

entities, and internet activity for the SpoofCard account occurred in March 2020. (*Id.* ¶ 20.) In view of the range of activity from February 2017 through March 2020 described in the affidavit, the nature and purpose of a SpoofCard account, the nature of the information sought, and the nature of the crimes under investigation, all of which the Court set forth in detail above, the Court finds the warrant was not temporally overbroad.

Holmes relies on *United States v. Jackson*, No. 18-cr-211 (JNE/ECW), R. & R. at 21–25 (D. Minn. Jan. 4, 2019), in support of his argument that the warrant was overbroad. (Def.'s Mem. Supp. Mots. Suppress at 8.) In *Jackson*, the court found a cell phone warrant overbroad because it did not limit the files on the cell phone that were to be searched and seized. *Jackson*, No. 18-cr-211 (JNE/ECW), R. & R. at. at 22, *R. & R. adopted*, slip op. at 4 (D. Minn. Feb. 26, 2019). Rather, the warrant authorized the seizure of "any and all" files and records concerning communications to and from the telephone. *Id.* The files were not even limited to those that could be connected to a crime, much less the criminal activity under investigation. *Id.*

*Jackson* is inapposite in two key respects. First, the warrant in *Jackson* authorized the search and seizure of all files on a cell phone, whereas here, the warrant authorized the search and seizure of records and information for a single SpoofCard account. Second, the warrant in *Jackson* did not limit the files to be searched and seized by the criminal activity under investigation, whereas the warrant in this case did.

In sum, the Court finds that the SpoofCard warrant was not overbroad and described with particularity the information to be seized. Consequently, the Court recommends that Holmes' motion to suppress evidence seized pursuant to the warrant be

11

denied.

      **C.**      **The *Leon* Good Faith Exception to the Exclusionary Rule**

Even if the search warrant lacked particularity or was overbroad, the Court finds that the good-faith exception to the exclusionary rule established in *United States v. Leon*, 468 U.S. 897, 922 (1984), would apply in these circumstances. "Under the *Leon* good-faith exception, disputed evidence will be admitted if it was objectively reasonable for the officer executing a search warrant to have relied in good faith on the judge's determination that there was probable cause to issue the warrant." *United States v. Grant*, 490 F.3d 627, 632 (8th Cir. 2007). "Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral [judge] has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in 'objective good faith.'" *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012). That said, *Leon* does not apply "when it is obvious that no reasonably competent officer would have concluded that a warrant should issue." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Holmes has not shown that the judge who issued the warrant "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth," or that that the issuing judge "wholly abandoned [her] judicial role." *See Leon*, 468 U.S. at 923. Nor was Special Agent Yarbrough's affidavit so lacking in probable cause that reliance on it was objectively unreasonable, or the warrant so facially deficient that its validity could not be presumed. *See id.* Consequently, the *Leon* good faith exception would save the warrant even if it

was overbroad or lacked sufficient particularity.

### III.     Motion to Suppress Statements

Holmes seeks to suppress statements he made to law enforcement officers during an interview on July 23, 2018. He contends the interview was a custodial interrogation for which no *Miranda* warning was given. (Def.'s Mem. Supp. Mots. Suppress at 11.)

On July 23, 2018, City of Bloomington Police Detective Carolyn Kne interviewed Holmes as part of her investigation of Mays.[3] (Mot. Hr'g Tr. at 13, 15.) Detective Kne knew Holmes from an encounter with him in the fall of 2017. (*Id.* at 35.) Detective Kne was one of several officers who responded to a call from "her victims," who said someone had moved into their house without authorization. (*Id.* at 16.) After the officers arrived at the house, they learned the person was Holmes. (*Id.*)

During the next several months, Holmes called Detective Kne and said he wanted to talk about Mays. (*Id.* at 16, 35.) Holmes and Detective Kne exchanged voicemail messages and short phone calls, as Detective Kne tried to schedule a time for Holmes to come to the police station and talk in person. (*Id.* at 17, 35.) The meeting ultimately was scheduled for July 23, 2018. (*Id.* at 20.)

The interview occurred in a "soft interview room," which is located in a secured area of the police station but not in the area where individuals are held in custody. (*Id.* at 21, 42.) The room was similar to a witness interview room, and individuals who are being held in custody are not interviewed there. (*Id.* at 21–22.)

---

[3] Detective Kne has since retired from the Bloomington Police Department.

13

Holmes came to the police station voluntarily, and Special Agent Yarbrough attended the meeting with Detective Kne. (*Id.* at 23, 25.) Detective Kne did not anticipate arresting Holmes at the end of the interview, so she did not advise him of his *Miranda* rights. (*Id.* at 23.) She considered him to be a witness, not a suspect. (*Id.* at 43–44.) Holmes was not handcuffed or otherwise restrained at any time. (*Id.* at 24.) The door to the interview room was not locked, but there was no more than two feet between the back of each officer's chair and the wall. (*Id.* at 24, 38–39.) The video of the interview shows that Special Agent Yarbrough pointed to the chair where he wanted Holmes to sit and said, "Go ahead and have a seat." (Gov't's Ex. 4A at 1:31.)

The tone of the interview was friendly, and Holmes was talkative. (Mot. Hr'g Tr. at 24.) Holmes did not appear frightened, and he willingly answered the officers' questions. (*Id.* at 25.) The officers did not shout or make threats or promises. (*Id.* at 26.) The officers were not wearing police uniforms, but Detective Kne had her firearm and badge on her belt. (*Id.* at 26, 39.) Detective Kne could not recall at the motion hearing if her gun would have been visible to Holmes. (*Id.* at 39.) The interview lasted about an hour and a half. (*Id.* at 21.) Holmes was not arrested at the end of the interview. (*Id.* at 27.) Detective Kne walked Holmes out of the police station because the interview room was located in a secured area. (*Id.* at 41.)

Near the end of the interview, Detective Kne and Special Agent Yarbrough arranged to meet Holmes at his house, and they left the station separately from Holmes. (*Id.* at 27–28.) Holmes was not taken into custody later that day. (*Id.* at 28.)

Under *Miranda v. Arizona*, "the prosecution may not use statements . . . stemming

14

from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). Those procedural safeguards are met when, "[p]rior to any questioning, the person [is] warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney . . . ." *Id.* *Miranda* warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way." *See id.*; *see also Stansbury v. California*, 511 U.S. 318, 322 (1994).

In deciding whether a person was "in custody," courts examine "the presence and extent of physical and psychological restraints placed on the person's liberty during the interrogation in light of whether a reasonable person in the suspect's position would have understood his situation to be one of custody." *United States v. Axsom*, 289 F.3d 496, 500 (8th Cir. 2002) (quoting *United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir. 1990)) (cleaned up); *see also United States v. Czichray*, 378 F.3d 822, 828 (8th Cir. 2004). The Eighth Circuit Court of Appeals has identified six common indicia of custody:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*Griffin*, 922 F.2d at 1349.

Beginning with the first factor, Holmes was not informed during the interview that his participation was voluntary, that he was free to leave, or that he was not considered under arrest. The first factor therefore weighs in favor of custody.

As to the second factor, Holmes possessed unrestrained freedom of movement during the interview. Although he sat in the chair Special Agent Yarbrough gestured toward, he walked into the room freely and on his own accord and did not attempt or ask to sit anywhere else. He was not handcuffed or otherwise physically restrained. He touched his phone on occasion during the interview and gestured freely. He did not attempt to stand up or walk past the officers, nor did he otherwise indicate he wished to do so, so the proximity of their chairs to the wall is of minimal significance. Thus, the second factor weighs against custody.

Holmes initiated contact with Detective Kne and came to the police station voluntarily. He appeared eager to talk with Detective Kne and Special Agent Yarbrough, and he voluntarily responded to their questions. The third factor therefore weighs against custody.

As to the fourth factor, neither Detective Kne nor Special Agent Yarbrough employed strong-arm or deceptive tactics during questioning. Accordingly, this factor weighs against custody.

Proceeding to the fifth factor, the atmosphere was police-dominated, but only slightly so. The interview occurred in a police station, but in a witness interview room where noncustodial witnesses are usually interviewed. Two law enforcement officers were present, but neither wore a full police uniform, and it is not known whether Holmes could

see their guns or badges. The interview was recorded, but there is no evidence Holmes was aware of that. The fifth factor only slightly favors a finding of custody.

Finally, Holmes was not arrested at the end of the interview, nor was he arrested later that day. The sixth factor therefore does not support a finding of custody.

On balance, the Court finds that Holmes was not in custody during the interview on July 23, 2018, and thus, a *Miranda* warning was not necessary. The Court recommends that Holmes' motion to suppress statements be denied.

Accordingly, based on the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant Bernard Holmes' Motion to Suppress Statements, Admissions, and Answers [ECF No. 41] be **DENIED**; and

2. Defendant Bernard Holmes' Motion to Suppress Evidence Obtained as a Result of Search and Seizure [ECF No. 42] be **DENIED**.

Dated: July 19, 2021

*s/ Hildy Bowbeer*
HILDY BOWBEER
United States Magistrate Judge

### NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under D. Minn. LR 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to

those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.