UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| United States of America, | File No. 20-cr-221 (ECT/HB) |
| Plaintiff, | |
| v. | **OPINION AND ORDER** |
| Bernard Holmes, | |
| Defendant. | |

---

Matthew S. Ebert, United States Attorney's Office, Minneapolis, MN, for Plaintiff United States of America.

Douglas L. Micko, Office of the Federal Defender, Minneapolis, MN, for Defendant Bernard Holmes.

---

Defendant Bernard Holmes is indicted on a charge of impersonating a federal officer. ECF No. 1. He has moved to suppress evidence seized under a search warrant, ECF No. 42, as well as statements that he made in an interview with two investigating officers at a police station, ECF No. 41. In a Report and Recommendation ("R&R"), Magistrate Judge Hildy Bowbeer concluded that both motions should be denied. R&R at 17 [ECF No. 61]. Holmes filed objections to the R&R, and the Government filed a response. ECF Nos. 62, 63. Because Holmes has objected, the R&R will be reviewed de novo. *See* 28 U.S.C. § 636(b)(1); Local Rule 72.2(b)(3). Based on that review, the R&R will be accepted.

I

Holmes's first motion concerns a search warrant signed by Magistrate Judge Becky R. Thorson on May 26, 2020. *See* Gov't Ex. 2 at 1.[1] The affidavit supporting the warrant provides necessary context to understand Holmes's argument. The affidavit describes a fraudulent scheme by which an individual named Otis Mays, Jr. convinced a married couple in Minnesota to pay him over $300,000. *Id.* ¶¶ 5–6. Among other things, Mays told the couple that their son was under investigation for federal terrorism charges and that he was a lawyer who could make the charges go away. *Id.* ¶¶ 5–6, 8. There were no such charges, and Mays was not a lawyer. Mays later pleaded guilty to wire-fraud charges. *Id.* ¶ 7; *see United States v. Mays*, No. 19-cr-76 (ECT/HB) (D. Minn.), ECF Nos. 61, 62.

During the scheme, the victim couple received at least one phone call from a man who identified himself as "Agent Tidwell" and indicated that their son was facing criminal charges. Gov't Ex. 2 ¶ 9. The call came from the main number for the FBI's Minneapolis Field Office. *Id.* ¶ 10. A search of Mays's electronic devices revealed recorded phone calls between Mays and an "Agent Tidwell" at the phone number 612-615-xxxx. *Id.* ¶ 11. AT&T records showed that Holmes was an authorized user of the 612 number, and Holmes himself later confirmed to police that the number belonged to him. *Id.* ¶¶ 12, 14. After reviewing more AT&T records, law enforcement discovered that the 612 number had repeatedly contacted a number for SpoofCard, LLC, "a company that allows its paying

---

[1] The warrant and the affidavit are separately paginated. In keeping with the R&R, citations to the warrant will refer to page numbers, and citations to the affidavit will refer to paragraphs.

customers the capability to alter (or 'spoof') the caller ID that is displayed on a called party's telephone." *Id.* ¶ 13.

According to records received from SpoofCard, an account associated with the 612 number was created in December 2016. *Id.* ¶ 18. The account made approximately 116 phone calls between February 2017 and February 2020, including four in July 2017 that spoofed the main number for the FBI Minneapolis Field Office. *Id.* Eighty-five of the calls, including all four involving the FBI number, were recorded. *Id.* ¶¶ 18–19. The SpoofCard records further revealed that the same account "placed a series of phone calls that spoofed the phone numbers for various state and local officials" between November 2017 and November 2018, and the account showed activity as late as March 31, 2020. *Id.* ¶¶ 20–21.

The resulting warrant authorized law enforcement to search and seize certain records held by SpoofCard. The "property to be searched," listed in "Attachment A" of the warrant, was all "information associated with" the SpoofCard account that was within SpoofCard's "possession, custody, or control," including "any records, files, logs, or information (including the content of recorded telephone calls)" that had been deleted but were "still available to SpoofCard[.]" *Id.* at 1, 4. The "particular things to be seized" were described in "Attachment B." *Id.* at 1, 5–6. Attachment B began by further delineating the information SpoofCard was required to disclose to the Government. This included "all recorded telephone conversations associated with the account," "[a]ll records or other information regarding the identification of the account," the "types of service utilized," and "[a]ll records pertaining to communications between [SpoofCard] and any person

3

regarding the account[.]" *Id.* The attachment then authorized the Government to seize this information to the extent it "constitute[d] evidence of violations of 18 U.S.C. §§ 912 and 1343 and related offenses, occurring in 2016 and after involving Bernard Holmes and/or Otis Mays, Jr.," including "information pertaining to":

> (1) any information involving a scheme and artifice to defraud through false claims and statements to others in order to induce them to make payments;
>
> (2) any information involving a party falsely assuming or pretending to be another party in order to demand or obtain something of value; [and]
>
> (3) any information involving a party falsely assuming or pretending to be an officer or employee acting under the authority of the United States (or any department, agency or officer thereof).

*Id.* at 6.

Holmes's primary argument is that the warrant does not "particularly describ[e]" the records to be searched and seized. U.S. Const. amend. IV; *see* Def.'s Objs. at 7–9 [ECF No. 62].[2] Magistrate Judge Bowbeer concluded that the warrant was sufficiently particular "given the type and nature of the information to be seized [and] the nature of the crimes under investigation," among other factors. R&R at 7–12.

To satisfy the Fourth Amendment's particularity requirement, a warrant must be "sufficiently definite to enable the searching officers to identify the property authorized to

---

[2] Holmes previously argued that the warrant was "overbroad in terms of its temporal scope." Def.'s Mem. in Supp. at 7 [ECF No. 57]. Magistrate Judge Bowbeer appropriately rejected this argument because the records sought covered a time period that corresponded with the conduct described in the affidavit, R&R at 10–11, and Holmes does not renew this argument in his objections.

4

be seized." *United States v. Summage*, 481 F.3d 1075, 1079 (8th Cir. 2007) (citation omitted). This is a standard "of practical accuracy rather than of hypertechnicality," and the degree of specificity required "depend[s] on the circumstances of the case and on the type of items involved." *United States v. Sigillito*, 759 F.3d 913, 923 (8th Cir. 2014) (internal quotation marks and citation omitted). "[F]raud cases present unique particularity problems" because it is often difficult or impossible to distinguish in advance between records that are evidence of fraud and those that are not. *Id.* at 924; *United States v. Kail*, 804 F.2d 441, 445 (8th Cir. 1986). Given this concern, "a search warrant involving a scheme to defraud is 'sufficiently particular in its description of the items to be seized if it is as specific as the circumstances and nature of activity under investigation permit.'" *United States v. Saunders*, 957 F.2d 1488, 1491 (8th Cir. 1992) (quoting *Kail*, 804 F.2d at 445).

Magistrate Judge Bowbeer correctly determined that the warrant is sufficiently particular. Although the warrant required the disclosure of "all information" associated with the SpoofCard account, it elaborated on that general requirement by providing a list of more specific categories of records to be searched. *See United States v. Fiorito*, 640 F.3d 338, 346–47 (8th Cir. 2011) (explaining that the general phrase "[e]ntire files involving [defendant]" had to be "read in the context of" a subsequent, non-exclusive "list of specific documents sought"); *see also Andresen v. Maryland*, 427 U.S. 463, 480–81 (1976). The warrant then imposed significant limitations on what information law enforcement could seize. The information seized had to "constitute[] evidence of violations of" two specific statutes: 18 U.S.C. §§ 912 and 1343. *See Saunders*, 957 F.2d

5

at 1490–91; *United States v. Brown*, No. 19-cr-110 (ADM/ECW), 2019 WL 7838276, at *13 (D. Minn. Sept. 20, 2019), *report and recommendation adopted*, 2019 WL 6607240 (D. Minn. Dec. 5, 2019). Those violations must have "occur[ed] in 2016 and after" and must have "involv[ed] Bernard Holmes and/or Otis Mays, Jr., and/or any users of the" relevant account. Gov't Ex. 2 at 6. And the warrant gave specific examples of the nature of the fraudulent conduct at issue, including making false statements or assuming a false identity in order to obtain money or other things of value. *See United States v. Gardner*, No. 13-cr-35 (PJS/SER), 2015 WL 1537602, at *5 (D. Minn. Apr. 6, 2015).[3] These who-what-when-how details make it sufficiently clear that the warrant was "as specific as the circumstances and nature of the activity under investigation permit[ted]." *Saunders*, 957 F.2d at 1491 (citation omitted).[4] It is therefore appropriate to deny Holmes's motion to suppress evidence.

## II

Holmes's motion to suppress statements arises from an interview he gave with two law enforcement officers at a Bloomington, Minnesota police station on July 23, 2018. Tr. of Hr'g on Mot. to Suppress at 15 ("Tr.") [ECF No. 55]. One of those officers, former Bloomington Police Detective Carolyn Kne, testified at the hearing on Holmes's motions,

---

[3]   In light of these references to the nature of the conduct at issue, Holmes's argument that the warrant was overly broad because it cited the wire fraud statute—a law that proscribes a broad range of conduct—is unpersuasive. *See* Def.'s Objs. at 8–9.

[4]   For the same reasons, the warrant was not "'so facially deficient' that the executing officer could not reasonably presume its validity." *United States v. Notman*, 831 F.3d 1084, 1089 (8th Cir. 2016) (quoting *United States v. Leon*, 468 U.S. 897, 923 (1984)).

and a video and transcript of the interview are in the record. *Id.* at 13–14; *see* Gov't Exs. 4A, 4B.

Detective Kne first encountered Holmes in the fall of 2017, when she and other officers responded to a call from people she described as "[her] victims" reporting that Holmes had moved into a house they owned without their authorization. Tr. at 16. No evidence in the record suggests that encounter ended in an arrest or any criminal charges. Over the next several months, Detective Kne and Holmes "played phone tag" because Holmes "want[ed] to talk to" the police about Mays. *Id.* The two eventually agreed that Holmes would come to the Bloomington police station on July 23, 2018. *Id.* at 20–21.

Holmes spoke with Detective Kne and FBI Special Agent Travis Yarbrough in a "soft interview room," which is a setting used for conversations with "witnesses" rather than people in custody. *Id.* at 21–22. The room was in a "secured area" of the station, and the door to the room was closed but not locked. *Id.* at 24, 42. Holmes was seated in the chair furthest from the room's door. *See* Gov't Ex. 4A. Detective Kne and Agent Yarbrough were both dressed in plain clothes. *Id.*; Tr. at 26. Detective Kne was armed, but it is not clear whether Holmes could see her firearm. Tr. at 39. She testified that she did not give Holmes *Miranda* warnings at the outset of the conversation because she did not consider him a suspect or anticipate that he might be arrested at the end of the interview. *Id.* at 22–23, 43–44; *see Miranda v. Arizona*, 384 U.S. 436 (1966).

During the interview, all three people maintained a calm, casual, and friendly tone. *See* Gov't Ex. 4A. Detective Kne and Agent Yarbrough did not raise their voices or make any explicit displays of authority. In the video of the interview, Holmes appears

7

comfortable. He alternatively leans forward with his forearms on the table and back in a casual pose in his chair. *Id.* at 4:15–25, 4:50–5:05. On several occasions he picks up his cell phone, which he had set on the table in front him, to check notifications or look up information. *E.g.*, 5:20–25, 1:02:50–03:15. He willingly answers the officers' questions. At the end of the interview, the officers arranged to meet Holmes at his house, Detective Kne told him that she would walk him out, and the officers left the station separately from him. Tr. at 27–28. Holmes was not arrested at the conclusion of the interview. *Id.* at 27.

Holmes argues that the interview was a custodial interrogation and that, because he received no *Miranda* warnings, the Government may not use statements from the interview in its case-in-chief. Def.'s Objs. at 10–12. Magistrate Judge Bowbeer concluded that no warnings were necessary because Holmes was not in custody at the time of the interview. *See* R&R at 13–17.

"*Miranda* requires law enforcement officials to advise a person in 'custody,' prior to 'interrogation,' of his right to be free from compulsory self-incrimination and to the assistance of counsel." *United States v. Sanchez-Velasco*, 956 F.3d 576, 580 (8th Cir. 2020). A person is "in custody" if there has been a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (internal quotation marks and citation omitted). "The issue turns on whether a reasonable person in the suspect's shoes would have felt free to end the interview." *United States v. Roberts*, 975 F.3d 709, 716 (8th Cir. 2020). To answer this question, the Eighth Circuit generally considers six non-exclusive factors:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to

8

>leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). But a court must consider the "totality of the circumstances"; it cannot simply "count[] up the number of factors on each side of the balance and render[] a decision accordingly." *United States v. Czichray*, 378 F.3d 822, 827 (8th Cir. 2004).

Holmes was not in custody. First, it is true that the officers never told him he was free to go, but this is "not dispositive." *United States v. Lowen*, 647 F.3d 863, 868 (8th Cir. 2011). The absence of such a notice weighs little, if at all, in favor of custody when considered alongside the fact that it was Holmes's idea to have the conversation in the first place.

Second, Holmes was never physically restrained during the interview. The video shows Holmes repeatedly gesturing with his hands and arms and checking his cell phone. *See United States v. LeBrun*, 363 F.3d 715, 722 (8th Cir. 2004). The interview room was located in a secured part of the police station, but the door to the interview room itself remained unlocked. Because Holmes never tried to get up and leave, it is "unclear what would have happened if []he had," *United States v. Sanchez*, 676 F.3d 627, 631 (8th Cir. 2012), but nothing about the officers' tone or body language suggested they would have tried to stop him. On the whole, this factor weighs against custody.

Third, as already noted, it is undisputed that Holmes initiated the conversation with the officers. And although Detective Kne chose the location, Holmes "voluntarily acquiesced" to that request. *Griffin*, 922 F.2d at 1349. This factor weighs against custody.

Fourth, Holmes also seems to agree that the officers did not employ any "strong arm tactics or deceptive stratagems." *Id.* Both officers kept a calm and casual demeanor. They did not raise their voices or physically intimidate Holmes in any way. The interview began and ended with cordial handshakes, and Holmes appeared comfortable throughout. This factor weighs against custody.

Fifth, the setting was at least marginally "police dominated." *Id.* The interview occurred in a small, windowless room in a police station. The officers outnumbered Holmes two-to-one. But classic indicia of police authority were not present. Both officers were in plain clothes, and although there is no evidence that Holmes *couldn't* see Detective Kne's firearm, there is also no evidence that he could. For these reasons, this factor weighs only slightly in favor of custody.

Finally, Holmes was not arrested at the end of the interview. This is consistent with Detective Kne's testimony that she considered Holmes a "witness," not a suspect, and that she chose the "soft interview room" at least in part because she did not anticipate taking him into custody. Tr. at 21, 43–44.

Considering the *Griffin* factors in the context of the overall tone of the interview, a reasonable person in Holmes's shoes would have felt free to leave. Officers were therefore

not required to give him *Miranda* warnings, and it is appropriate to deny his motion to suppress.[5]

## ORDER

Therefore, based on all the files, records, and proceedings in the above-captioned matter, **IT IS ORDERED THAT**:

1. Defendant Bernard Holmes's Objection to the Report and Recommendation [ECF No. 62] is **OVERRULED**;

2. The Report and Recommendation [ECF No. 61] is **ACCEPTED**;

3. Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [ECF No. 42] is **DENIED**; and

4. Defendant's Motion to Suppress Statements, Admissions, and Answers [ECF No. 41] is **DENIED**.

Dated: September 13, 2021          s/ Eric C. Tostrud
                                   Eric C. Tostrud
                                   United States District Court

---

[5] This conclusion makes it unnecessary to consider the Government's alternative argument that portions of the interview consisted of "routine biographical" questions not subject to *Miranda*'s requirements. Gov't Resp. to Def.'s Objs. at 6 n.1 [ECF No. 63].